Please all rise. Here you hear you hear you. This honorable appellate court, the second judicial district is now back in session pursuant to adjourn. Please be seated. Okay, this is one one, John quick the basic case. Good morning. Whenever you are ready. Good morning. I'm Bill catchatory for Rockford represent the balance in this case. And I would like to say to begin with that. I think that the case Watkins versus Schmidt control this case. And it seems pretty clear based upon that. The issues in this case that go without saying that the plaintiff appellant does rely upon Watkins versus Smith in this case and particularly as to the 50% rule that Judge Gordon and trial court indicated that no verdict could ever stand because he would find that she would be as a matter of law. Well, what can zoom on the facts is quite different, isn't it? Well, except for the 50% rule, which I think is pretty controlling here to for any trial judge to hold that no verdict could ever stand without a trial. Our review is the noble. So regardless of how the trial court rules our reviews and although what what evidence is there? What proper evidence of excessive speed is there in the record to create a material issue of fact? I think there is a lot of course without a trial and emotional summary judgment were precluded from seeing the witnesses on the stand and the jury is and and so on and so forth and their demeanor which I think is crucial to a case like this. And this is not just a little minor injury. This woman was killed as a result of this accident. And would you agree that turning left from a primary or preferential road onto a secondary road is one of the most dangerous maneuvers. The driver can make no, I'm actually even on you know, a intersection that does not have any signal for or stop sign that it's a through and through roadway and stop signs for the other for the other those are the facts in this case. There were no control traffic control signals, but there are many things that mitigate that premise and one the record shows that the truck driver in question here had driven this route for 10 years or so and some of the other discovery indicated might have been a lot longer than 10 years. So we have a defendant truck driver here who was very very familiar with this particular intersection, which does make a big difference. I think how well because he was aware he was on notice that a vehicle there was a the vehicle would be making a left turn at this intersection. He might not if he hadn't first time he ever drove this route. He may not even know there was a left turn possible. Whether he drove this vehicle a thousand times or one time. How can one anticipate an oncoming vehicle turning in front of you abruptly absent signals or signage even if the vehicle puts on a turn signal? How can he anticipate where's the evidence of negligence? Well, just let me address that your honor. First of all, I don't think there was any any testimony from anyone including the witnesses that there was an abrupt turn by this by the decedent in this case. Okay, then she passed the vehicle in question and made a left turn there at this intersection and we have cited in our complaint a violation of 601 speed. What about Jasmine's testimony that there was no way for him to avoid the collision? Well, I assume not going 55 miles per hour. Oh, more. I guess he couldn't. He's traveling in that distance between the crest and where she was turning to be maybe a second or two. So again, get big. Where's the where's the evidence of excessive speed? Well, I think there is a big issue on that and that would be something we would share like the jury to hear is the evidence. You have to have evidence. You cannot just have pure speculation, even though all reasonable inferences go to the non-movement. Well, where's the evidence of excessive speed? Let's talk about skid marks. We talked about the police found the Sheriff's Department found there 55 feet of skid marks. Also, there's not much evidence here, but the police also found that when she was hit broadside, her vehicle was pointed in an easterly direction. This truck was traveling at such a speed that it pushed this vehicle against the trajectory of the tires of going being north being going pointing eastward in this field for 200 feet or more. That is a lot of speed that a expert witness reconstruction expert might be able to do. So you may be traveling at 65 miles per hour. You just said might. What's the expert's opinion? Well, we have to 13 disclosures. Are those were those before the trial court? We just disclosed to 13 and then the court granted sovereign judgment for the defendant. So we didn't get into that. So it's not before us for review. Not before you for review. The only thing is we did. We did file a 213 F3. Defendants have objected to the use of that in this case, even though it's part of the record. It's been disclosed in this case that we did retain an expert to come to testify in the event of trial, which we are looking might have in this case. And so is it talking about speed? Yes, please go ahead. You mentioned to me speed. I don't think there's any way in the world. Any jury would listen to a man who came 10 miles down the road and traveled it for 10 years or more and which is undisputed in this case that he should have been going 55 miles per hour at this intersection when he knew that vehicles made a left turn at this intersection. He should have been traveling at a much reduced rate of speed. And that would be one of the things we would present to the jury in this case. Where is that obligation under the 601 that you cited? I mean, it doesn't say you have to travel less than the speed limit. It says you have to be aware and where was he not aware or where were the conditions such that he should have been more cautious? The statute that we cited, 601, stated that this was a rise or crest of a hill and that he had a duty to reduce his speed so he could see what's on the other side. So nothing because the speed limit is 55 miles per hour gives him the right to continue when he knew this and he knew there was a crest and he couldn't see anything over the hill. You mean you have to reduce your speed to see what's on the other side of the intersection in order to avoid a collision happening at the intersection that you can see? Is that what the argument is? My argument is that yes, you should reduce your speed. The statute provides you should reduce your speed at the crest of a hill for those reasons. But the dip where he lost sight of the van was some 600 feet past the intersection. No, I don't think that's what the evidence showed. It was just over this crest of the hill. But let me get this straight. So you're not saying that there was an obstruction in the way of him seeing someone turning left? No, not at all. So he should be reducing his speed to avoid a collision that may happen past the intersection, which would then have stopped him from colliding with the car in this intersection. That's what I believe the statute provides. Really? Yes. There's 1,100 feet or so of visible roadway and the intersection is pretty much in between that 600 and 500 feet, correct? The intersection. Before the crest that you're talking about? I would say something like that would be accurate. I think that the record indicates that. And what is a driver supposed to do as you're going the speed limit? Are you always supposed to be on the alert that somebody may violate the left-hand turn law and pull in front of you? Well, number one, I don't think that the deceiving had an opportunity to deceive him because of the crest, number one. And it's not illegal in this state to make a left turn. That's pretty clear, too. So as long as you can do it with safety, I think the law permits a left turn. And I know in the defense, from their pleadings, they point to Section 11902 of the Vehicle Code, which creates a duty on the left-hand vehicle turning left to yield the right-of-way to approaching vehicles, correct? That's right. How does that play into your argument that a jury could have determined that Mr. Hanneman was 50 percent or more negligent in this circumstance? Because she could have never seen this truck until it crested that hill or that rise. She didn't make a – this is not an area where you have a mile that you can see in front of you and see a left-hand vehicle. It's not a mile. It's approximately two football fields. Pardon me? It's about two football fields in length, right? No, that's not the case here. Three hundred feet is a football field, right? Pardon me? The playing field is 300 feet on a football field. That's correct. And this is at least 500 or more feet, correct? Well, not – I guess I don't understand your question. You're saying that she couldn't – how do you know that she could not see him? Well, I've been there. I've investigated this accident. I've seen it. I know all about this accident and all about this scene, and I'm going to tell you I don't think that either – disappeared after he went over the crest. But if she cannot – or if you're saying she could not see that vehicle, doesn't she have an obligation to slow before she makes that turn? I think she did. I think she did turn. She passed through this sort of area and made a left turn. The yaw marks seem to indicate that she didn't do much slowing. She just kind of did a – she went like that without really paying any attention, and my arm just went to the left quickly because nobody else can see it. I understand. But there's no indication that she stopped. There are actual marks to indicate that she didn't stop. That's because she couldn't see him. Well, then if she couldn't see him, why didn't she slow down? And he couldn't see her either until he got to the top of that crest. Okay. You said that speed – he obviously was speeding because of where the truck and the car ended up. He's carrying about 60,000 pounds. How do you deal with that? I mean, that alone could have pushed that car. So how can you just attribute it to speed? I deal with that because he, as a truck driver, for many, many years, and I think more than 20 years, had been traveling this route for at least 10 years, if not 20 years. But at any rate, he knew, and I think his testimony was, and it's in the record, that it took this vehicle approximately with this weight 500 feet to come to a rest before he could bring it to a stop. Well, being familiar with this intersection, it's my and plaintiff's contention that he should have been slowing his vehicle appropriately so that when he got to the crest and he could in fact actually envision her, he would be in a better position to bring this vehicle to a stop or slow so maybe this fatality would not occur. But didn't he, if he wasn't turning, have the right-of-way? Well, I think that would be up to the jury to determine, not the court, because we don't know that, and we know without a jury trial the jury cannot determine the demeanor of the witnesses, the bias of the witnesses. So Briarsville testified, the mother and the daughter testified, that their husband, her husband, the mother's husband, was a truck driver, and they were four truck drivers, okay? So we would like to have gotten that before the jury, too, because, you know, she was behind that vehicle, but, you know, they were obviously biased witnesses. They didn't believe this truck driver should be responsible for this accident, from what I gathered from their testimony. Let's come back to what the actual evidence was that was before the trial court, okay? For some 500 feet north and 600 feet south of the intersection, the roadway was effectively level, correct? Except for the crest, yes. I believe the crest, the question is, for 1,100 feet, there's level roadway before and after the intersection, correct? 600 and then 500, correct? Except, of course, for the rise or crest of this little hill played in that. You agree with the 500 feet and 600 feet north and south? North and south of this crest, sure. I would agree with that. I don't think that's in dispute. In your research, have you found a case that would support your theory on turning onto a secondary road in front of someone who has the right-of-way abruptly? You keep using the word abruptly. I would object to that. Well, that was the evidence. I don't think it was. Well, the sheriff's deputy who was the accident reconstructionist testified that the yaw marks indicated an abrupt turn. Was that the evidence? Was that the evidence before the trial? I think there was evidence to that effect, yes. Have you found a case that would support a finding of negligence or the denial of summary judgment on facts like these? Well, I would say I've had these cases and have tried these cases as well. You're talking about a reported case? But not so reported cases that I have that I can cite to this court, that's for sure, except for the statute stating that, you know, to reduce speed. Well, reduce speed, you can't look at that in the abstract. You have to look at the obligation of the plaintiff as well, correct, and what her duties were in relation to that. Freedom of contributory negligence and comparative negligence, absolutely, I do agree with that. In your research, did you run across Reese v. Lehman, a 1954 Illinois Supreme Court case? I'm sorry? A 1954 Illinois Supreme Court case, did you run across that? The 54? 1954, it's the only case I could find close to these facts where a driver, and it was a bench trial reviewed by the Supreme Court because it's a jury question, it's a right to a jury question, but the court addressed the situation and they said under the foregoing circumstances, the defendant had a duty to yield the right way to plaintiff and to use reasonable care to avoid hitting him. Defendant's failure to do so constituted negligence which approximately caused the injuries, and the court went on to say, the foregoing facts and circumstances under the record is devoid of any evidence of plaintiff's contributory negligence which could bar his recovery herein. And in this case, the plaintiff was the person who was driving straight, not the person who turned left in front of him. I would agree with that if it was proved to me that there was an unobstructed view of that particular driver. There wasn't in that case. If there was an obstructed view, then I would not agree with that. In that case, the driver was a motorcycle behind another vehicle. When that vehicle passed, the defendant turned in front of the motorcycle and he blindsided her and was injured as a result. When you say unobstructed view of that driver, are you talking about the person turning left or the person going straight? Well, in this case, I'm submitting to this court that neither the truck driver nor the seat, in this case, that was making the left turn, could see each other until the truck got to the crest of the hill. So you understand that that is our premise of the facts of this accident. So that's what we believe occurred. We believe that was the intersection. And, again, I'm not saying that, as Honor just indicated, Justice Brickett, that there was an unobstructed view for a mile or so. And then, no, I would agree with what that case holds. I understand your argument. The question is whether or not there was some evidence before the trial court that created, in a light most favorable to your client, the estate, created a material issue of fact that should go to a jury. Yes, I think the fact that the skid marks of 55 feet of skid marks left by the truck, I think the truck pushing this vehicle some 200 feet, almost a football field short, by 100 feet or so, against the vehicle's tire would have taken tremendous. Now, we know there was like 60,000 pounds, possibly more, load in this vehicle with the weight of the truck and as well as the pallets that were carried. And so we do know that it was a heavy, big load. That is just another reason that I would have preferred going to a jury in this case, because then we could show what the duties might have been under those same similar circumstances rather than an empty truck and so on and so forth. And that is the basis. Judge Doherty went further and he indicated, same as they did in Watkins, that no way could she ever, ever be guilty of less than 50 percent or 51 percent comparative negligence. And now I think Watkins stands for the proposition that the court said clearly. We leave that to the finder of fact, not to the court. So I think on that basis alone, if you disagree with all the other things that we've been talking about here today, with all due respect, I say that this decision and this summary judgment must be reversed, because it certainly is contrary to the Watkins case by the Supreme Court of Illinois. So I urge this court to consider that very heavily, because I think it's quite important. And taken, how long did she know about this intersection and so on and so on? How familiar was the decedent? I don't know. I know she had just moved, I think, and this was going to her apartment, I believe, or something to that effect. But we know this man could be more familiar with this intersection. Her daughter's apartment, wasn't she? Her daughter's apartment. I think you're correct, Your Honor. I think it is her daughter's apartment, not her apartment. But I would ask that this court certainly consider the 50% finding that Judge Dorey is wrong, and contrary to Watkins, and send this back so we can have a jury trial. Thank you. You'll have an opportunity to reply, if you wish, after counsel concludes. Thank you. All right, Ms. Shelley? Good morning. May it please the court and counsel, my name is Stacey Shelley, and I represent It comes off on a regular basis. I represent the defendants at Belize in this case, Johnny Hanneman, Allen Gores-Lancic, Enterprises Incorporated, and JMB Express, LLC. I think the issue before the court today is whether the trial court correctly granted summary judgment in favor of the defendants. It's our position that based upon all the facts in the record and the applicable law, that the trial court properly found, first, that there was no evidence upon which a reasonable jury could find that the defendants breached any duty to Barbara Case. Second, that there was no evidence that Johnny Hanneman was the proximate cause of the plaintiff's claimed injuries. And third, that Barbara Case's comparative fault bars the plaintiff's claim for damages. What about the plaintiff's argument that the skid marks plus the pushing of the vehicle some 200 additional feet into the field creates an issue of fact for the jury regarding excessive speed. In other words, the plaintiff in this case thought she had time to turn, maybe she saw the truck, thought she had a safe interval, but the closing distance, because she only has 500 feet, she could not measure the closing distance properly, and because of the excessive speed, that's why the collision occurred. Well, I don't think that those skid marks, that the skid marks in and of themselves are not really evidence of anything other than that someone applied their brakes. That Mr. Hanneman applied his brakes? Yes, yes, sir. I mean, there's no other indication that those skid marks were from any other vehicle, is there? No, no, and I'm not trying to argue that Mr. Hanneman's vehicle did not create those skid marks. There's a couple of issues with those skid marks. First of all, despite what plaintiff argues in their briefs, I don't think it's even clear whether or not those skid marks were pre-impact or post-impact. Deputy Pearson, in his deposition towards the end of it, agreed that if the skid marks themselves were shorter than the total length of the vehicle, and I think that Johnny Hanneman testified that the trailer alone was 53 feet long, so plus whatever the truck on top of that was. I think in a later deposition, it's not part of this record, they established that as maybe an additional 18 feet, that if the skid marks in and of themselves were shorter than the total length of the vehicle, that he couldn't even say for certain whether or not those impacts were pre- or post-impact. In addition to that, I think perhaps the most important thing to keep in mind is that the plaintiff has provided no context for those skid marks. They simply stated this is a piece of evidence, and we should allow a jury to speculate on what those skid marks might mean without any evidence by anyone in this case that those skid marks are of the type that would not be made by a vehicle of that size traveling at highway speed, striking a vehicle of that size. What was the context in Watkins that allowed for the admission of those skid marks for this purpose? Well, the context in Watkins that allowed for the admission of those skid marks was there was significant evidence of differing speeds by the driver of the truck in that case. There was three different people who testified as to different speeds. They testified, I think he testified that he was going 20 miles an hour. There was testimony by two additional witnesses that put that speed somewhere between 20 miles an hour and 35 miles an hour. In addition, there was additional circumstances that would have necessitated him to slow that vehicle down. As he approached that intersection, they had a construction zone with a reduced speed limit. There were stopped vehicles. There was a railroad track, and there was a school bus, probably most importantly, that was blocking an intersection. The Watkins case simply considered those skid marks in the context of everything else that was going on in that case. The Supreme Court also held that apart from any issue about speed in that case, that the school bus itself blocking the intersection created special circumstances which would have required that driver to slow whatever his speed was as he approached that intersection. So that was a basis for them to reverse summary judgment in that case, absent and apart from any issue with respect to speed. I think the other thing where it differs in this case were that even if those skid marks were some evidence of excessive speed, whatever that may be, there's absolutely no evidence in the record to suggest that Mr. Hanneman was going anything other than 55 miles an hour, or maybe I think his testimony was possibly a little bit less than that as he approached that intersection, that there's no evidence whatsoever that that speed was a proximate cause of the collision. So even if you wanted to say that those skid marks were evidence of some excessive speed and invite a jury to speculate about what that might be, the speed of the vehicle is not a proximate cause of that occurrence. It's neither the cause in fact, it's neither the legal cause of the occurrence. Your argument is that this was an unavoidable collision? It is, Your Honor. And what's the unavoidable collision doctrine? Can that be resolved on summary judgment? Yes, I think it can when there's no question of material fact, when the evidence is undisputed and there's only one reasonable inference that can be drawn from that evidence. I believe that it can be determined on summary judgment. I think that the Kuhl case certainly believed that to be true. With the case where the, in fact, in that case, those facts are, in that case there was evidence that the, based on the testimony of the defendant driver, I think he was driving a half full dump truck, that he was exceeding the speed limit and that his view of the intersection was blocked by trees and maybe a fence. In addition, in that case, he's got a driver that's coming up to a stop sign, that he's got some, probably, expectation at some point that that vehicle will, in fact, cross in front of him. In this case, you don't even have that. You have vehicles, vehicles that are approaching each other, that I think is Justice Burkett pointed out, can see each other from 1,100 feet away as they're approaching each other, with no indication by the vehicle driven by, in this case, as it's approaching from the north, that it's going to do anything whatsoever. There's no question Mr. Henneman could see her. I, yes, I believe there, well, yes, he, the vehicle was visible to him, whether or not he was necessarily paying close attention to it until it began its move in front of him. But there's no reason that he should have been paying particular attention and been on, been concerned that that vehicle was going to turn in front of him based on her actions prior to, without indicating a visible signal to Mr. Henneman before she began to turn in front of him. Well, there was some evidence, wasn't there, that the signal had come on just before the turn? There was evidence that the vehicle behind this case could see a rear signal. There was no evidence in the record that there was a signal in the front that Mr. Henneman wouldn't have been able to see that was visible. What kind of vehicle was she driving? It was a Dodge Stratus. It would have been equipped. I would infer that it would have been equipped with a front blinker as well, correct? I assume that it was equipped with a front blinker. Whether or not that blinker was operational at that time, there's no evidence of that in the record. If that blinker had been on, would that have given him pause? Should he have slowed? I don't think that there was any basis for him to have believed that that vehicle was going to. . . At least briefly, correct? I think the testimony by Ms. Sarabia was that she saw it maybe blink once and then the vehicle immediately turned. Mr. Henneman, she still had a duty under both 601 and 902 to observe, do care. If she could see him, there was no reason for her. . . It was not reasonable for her to turn left in front of him in the manner in which she did. I think when you look at what the negligence standard is, which is what would a reasonable person do under exercising ordinary care, I don't think that it would be unreasonable for someone approaching an intersection, seeing someone coming towards them with a turn signal on, thinking that they were going to not obey their duty. In other words, he does not have the obligation to anticipate an unlawful movement of her vehicle. No, he does not. And I believe that the Salsic case says that the drivers are not required to have divine foreseeability that another vehicle is going to fail to exercise ordinary care. Is there any indication that he, Mr. Henneman, was able to see her vehicle go around the Sarabia vehicle? Or was that where the crest would have prevented that, his sight? There is nothing in the record about that. I believe that the testimony is that that actually occurred maybe a mile or two up the road. So I think in any event, it would have been far enough away that he would not have observed that. Because it did seem to bother or at least draw some interest from the two passengers in the Sarabia vehicle. They noticed her age. They thought it was a little unusual that she was my mother's age, that type of thing. Right. And that might be a kid movement as opposed to an adult movement. Right. And I think they particularly noticed it because Ms. Sarabia was driving Jasmine to court because she had a traffic ticket. But those, there's four lanes where Ms. Pace passed Ms. Sarabia. I think that the evidence is that that was maybe a mile past that. So he would not have been able to see that because he would have also been that much farther back as well. Okay. So other than a turn signal that he may or may not have seen briefly, was there any other indication that she was going to turn until she turned? Nothing in the record, Your Honor. Okay. I think that it's clear, in fact, that there's nothing that the plaintiffs can point to in this case that Mr. Hanneman should have acted in any way other than he acted, given the conditions present at the time. You know, 601, as noted by Your Honor, states, you know, speed must be decreased if it may be necessary to avoid colliding with any person or vehicle on or entering the highway in compliance with legal requirements and the duty of all persons to use due care. I think that the trial court properly found, and we would ask that this court find as well, that all of Mr. Hanneman's actions prior to enough time of the occurrence were those that a reasonable person in the exercise of ordinary care would have done, that he was driving the speed limit or less, that his vehicle was 20,000 pounds under the legal weight limit for a vehicle of that size. There was 600 feet to the south of the intersection, 500 feet to the north. The intersection itself is flat, so there's no questions about whether visibility was obscured, it was dry, it was midday, it was clear. There is simply nothing that can be pointed to that Mr. Hanneman did as he approached this intersection that any person in the exercise, any reasonable person in the exercise of ordinary care would not have done. I would also posit that Mr. Hanneman's actions, you know, as the collision was occurring, were further appropriate. He didn't lose control of his vehicle. You know, he was aware, I think he testified, too, that he was aware that there was a vehicle, in fact, behind Ms. Case. He took care to keep his vehicle from not entering that lane and also involving that vehicle in the collision. He never left his lane of travel to the left eventually, given the, as he attempted to kind of turn away to the right a little bit and hit the vehicle. He obviously went off the road. But I think that all of his actions in this case were those that a reasonable person in the exercise of ordinary care would have done. Have you found any case that would indicate because he has this experience on this road, whatever it may be, in excess of, you know, the years and the times he drives it per month, that a case that it would indicate he has a duty to literally slow down in anticipation of something that could happen? No, Your Honor, I have not. I have not found any case that suggests that he has a duty other than that established by the statute and the cases that have interpreted it. How about because he's got, he must have a commercial driver's license to be driving a rig of that nature? Is there anything under the conditions of his commercial driver's license that would require him to, as he approaches what he knows to be an intersection where vehicles turn, that he must take an additional precaution? No, Your Honor, I have not found a case that says that, and I would posit that the cases that I've reviewed and that we cited in our brief, that several of them deal with persons driving commercial vehicles that the appellate courts did not impose any higher standard than that of a reasonable person exercising ordinary care simply by virtue of driving a commercial vehicle. Justice Burke? All right. You can summarize, or, and we have no other questions. I would simply, on the basis that we have set forth in our brief and argued here today, I would ask that this Court affirm summary judgment on behalf of the defendants. Thank you very much for your time. Thank you. Mr. Cacciatore? I wonder how many times the defendant would have crossed this intersection since he was very familiar with it in his own testimony. He was 10 years familiar with this intersection. And how many times vehicles have made left turns in front of him during this period of time? And it could be twice that long, 20 years instead of just 10. So was he on notice? That's another question as to whether he was just going to continue. Let's assume he had no duty to do anything or slow his vehicle or approach this particular intersection with caution. If he was going 55, and I submit to you, I find it very unusual when witnesses tell me they're going 55 miles per hour. How fast were you going when you were a mile away, 55, you know, 2 miles, 55, and so on and so forth. That was his testimony. Well, commercial vehicles have governors. Most of them do. And I think his did have a governor. He did, but it was inoperative. And at any rate, multiple times he went through this intersection, okay? And I submit that I don't think anyone would play Russian roulette and just go through at whatever speed, even if it's 55 miles per hour. The speed limit, if you're familiar, that somebody could be making a left turn right in front of you. Well, there's probably people taking left turns in front of him on this right. He drives about 10 miles, so if he drives it, you know, hundreds, I don't know, thousands of times, there's probably people turning left off of probably every road that he's seen. So he's supposed to slow his vehicle at every road because in the past he's seen someone turn left in front of him? No, that's why I think the statute provides that the vehicle must reduce its speed when it approaches a crest of a hill because those are left turns that you may not see the vehicle making the left turn before you get there. I think that's precisely why we have 601 and to reduce your speed at the crest of a hill because otherwise you're right, you can't see anybody. Is there a sign? Was there an issue of signage posted? No. Signage for a crest of a hill? No, there was no sign. The defense has just articulated the unavoidable collision doctrine. Do you agree that if a collision is unavoidable, it's without proximate cause and the driver's acts or omissions in breach of a duty are not material? No, I would not agree with that. Unavoidable accident, I think, that does not occur. That's quoting Chevrolet in a case that you cited, Guy v. Stewart, the unavoidable collision doctrine. Do you disagree with that? Pardon me? Do you disagree with the doctrine? Well, you know, it's hard to imagine cases that are unavoidable. This looks like one. Well, I don't agree with that, of course. I wouldn't have taken this case, obviously. And, again, I think the problem I have, really, with the entire matter of this case is the motion for summary judgment that was granted. It deprived the estate, of course, of a trial, and we all would agree, I think, that jury trials are something, you know, that are very important in all personal injury cases because we then can, the jury can observe the demeanor of the witnesses. He says he's going 55 miles an hour. Maybe the jury would have thought he's going 65 miles an hour. Maybe they would have thought he wasn't telling the truth. There's a lot of different reasons. The problem with that argument is that even a summary judgment must be based upon facts in the record, not on speculation. Well, I know, but my point was, Your Honor, with all due respect, is that we didn't get a chance to have a jury trial here, and I understand that. I'm not asking you to consider it. But that's your opportunity in summary judgment to assemble facts, material pleadings, reports, testimony, affidavits, to create a material issue of fact. Correct? That's true. That's true, and I think that the fact that the physical evidence of this truck and how far it pushed the vehicle and so on is evidence of speed. And I ask this court, though, in addition, I stand on what I said earlier on the Supreme Court of Illinois case that said that that is a duty for the fact finder, and in this case, that's why I'm asking this court to reverse and remand this to the trial court. And I thank you very much. My privilege. Thank you. Thank you. All right. Again, thank you for your arguments here this morning. We will take the matter under advisement. We will issue a decision. Accordingly, we will stand in recess to prepare for our last case of the morning.